IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



Clerk, U.S. District Court
District Of Montana
Billings

SEP 2 5 2015

AMERICAN ECONOMY INSURANCE
COMPANY, an Indiana corporation;
AMERICAN STATES INSURANCE
COMPANY, an Indiana corporation; and
GENERAL INSURANCE COMPANY
OF AMERICA, a New Hampshire
corporation,

              Plaintiffs,

vs.

ASPEN WAY ENTERPRISES, INC.,
d/b/a Aaron's Sales and Leasing, a
Montana corporation; and HARTFORD
FIRE INSURANCE COMPANY, a
Connecticut corporation,

              Defendants.

CV 14-09-BLG-SPW

OPINION and ORDER

HARTFORD FIRE INSURANCE
COMPANY,

Counterclaimant and Crossclaim Plaintiff,

vs.

AMERICAN ECONOMY INSURANCE
COMPANY; AMERICAN STATES
INSURANCE COMPANY; GENERAL
INSURANCE COMPANY OF
AMERICAN; and ASPEN WAY
ENTERPRISES, INC.,

Counterclaim and Crossclaim Defendants.

1

ASPEN WAY ENTERPRISES, INC., d/b/a
Aaron's Sales and Leasing,

          Cross-Claimant,

vs.

HARTFORD FIRE INSURANCE
COMPANY,

          Cross-Defendant.

---

HARTFORD CASUALTY INSURANCE
COMPANY,

          Intervenor-Plaintiff,

vs.

AMERICAN ECONOMY INSURANCE
COMPANY; AMERICAN STATES
INSURANCE COMPANY; GENERAL
INSURANCE COMPANY OF
AMERICAN; and ASPEN WAY
ENTERPRISES, INC.,

    Defendants to Intervenor Complaint.

Before the Court is the Motion for Summary Judgment filed by American

Economy Insurance Company ("American Economy"), American States Insurance

Company ("American States"), and General Insurance Company of America

("General Insurance") (collectively "Liberty Mutual").  Liberty Mutual seeks a

declaration that it does not owe Aspen Way Enterprises ("Aspen Way") a duty to defend in two underlying actions. For reasons discussed below, the Court finds that according to the relevant insurance policies, Liberty Mutual is not required to defend Aspen Way in the underlying actions and grants the Motion for Summary Judgment.

## I. Background

Aspen Way is a franchisee of Aaron's Inc. and operates rent-to-own stores in at least Montana, Washington, and Wyoming. Relevant here, Aspen Way is defending two separate underlying actions related to its installation of software called PC Rental Agent onto computers sold or rented to customers. (Doc. 33 at 3-4).

### A. The Byrd Action

In May 2011, Crystal and Brian Byrd, individually and on behalf of a class consisting of Aaron's and its franchisees' customers, sued Aspen Way, Aaron's, and other Aaron's franchisees in the United States District Court for the Western District of Pennsylvania (the "Byrd Action"). (*Id.* at 3). The Byrds allege that on July 30, 2010, they entered into a lease agreement for a laptop computer from Aspen Way. (Doc. 62-3 at 25). On December 22, 2010, an Aspen Way store manager erroneously believed that the Byrds were delinquent in their lease payments and appeared at the Byrds' residence to repossess the computer. (*Id.* at

3

27). The store manager showed Brian Byrd a picture taken with the computer's webcam that showed him using the computer. (*Id.*). The Byrds asked the store manager to leave the residence and reported the incident to law enforcement. (*Id.*).

The Byrds later found out that Aspen Way took the picture using PC Rental Agent. (*Id.*). PC Rental Agent is a software product designed by a company named DesignerWare. (*Id.* at 17). Once installed on a computer, PC Rental Agent is generally undetectable by consumers. (*Id.* at 18). The installer can remotely install "Detective Mode" on the computer over the internet while it is in the consumer's possession. (*Id.*).

Once Detective Mode has been installed, the installer can secretly take photographs with the computer's webcam, capture keystrokes, and take screen shots. (*Id.*). Detective Mode transmits the gathered data to DesignerWare. (*Id.* at 19). DesignerWare then emails the data to the installer that activated Detective Mode. (*Id.*).

The Byrds allege that Aaron's franchisees have used PC Rental Agent since at least June 2009. (*Id.* at 17). The Byrds claim that the franchisees received private and confidential data after activating Detective Mode on their customers' computers. (*Id.* at 17-18). Such private data included private emails, keystroke logs for usernames and passwords, bank and credit card statements, Social Security numbers, and webcam photos of individuals in various states of undress. (*Id.*).

4

Aaron's franchisees could remotely install and activate Detective Mode through Aaron's corporate server. (*Id*. at 21). Aaron's franchisees would also access the acquired data from Aaron's corporate server. (*Id*.).

The Byrds claim that Aspen Way accessed their computer via Detective Mode on about 347 occasions. (*Id*. at 26). While Detective Mode is no longer operational on the Byrds' computer, the Byrds allege that information obtained by Aspen Way "has been repeatedly transmitted via unencrypted email and forwarded to unknown persons and locations." (*Id*. at 29). In all, the Byrds claim that more than 800 customers had private information transmitted to Aaron's franchisees. (*Id*. at 30). The Byrds allege these customers "continue to suffer harm or potential harm," as their information "may have been possibly transmitted to other third parties thereby placing them at an increased risk of fraud and identity theft[.]" (*Id*. at 24). Aaron's franchisees stopped using PC Rental Agent in January 2012. (*Id*. at 30). Even after ceasing to use PC Rental Agent, the Byrds claim that "franchisee employees and other unknown individuals continue to possess and potentially spread" private information obtained by the software. (*Id*. at 33).

In their Corrected Third Amended Class Action Complaint, the Byrds brought four causes of action against Aaron's and numerous franchisees, including Aspen Way. Count I alleges a violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511 ("ECPA"). The Byrds claim that the defendants violated the

5

ECPA by "intentionally collecting, transmitting, storing and disclosing, or endeavoring to disclose, to any other person," the contents of the private data collected by PC Rental Agent. (*Id*. at 34). Count II alleged a tort named Invasion of Privacy, Count III alleged a conspiracy to violate the ECPA, and Count IV alleged that Aaron's aided and abetted the invasion of privacy. (*Id*. at 35-40).

On March 31, 2014, the District Court granted in part and denied in part Aaron's Motion to Dismiss for Failure to State a Claim. *Byrd v. Aaron's, Inc.*, 14 F. Supp. 3d 667, 674 (W.D. Pa. 2014). The Court held that the Byrds sufficiently pled a claim for liability under the ECPA as to Count I. *Id*. at 675. The Court dismissed Counts II, III, and IV. *Id*. at 674. As to Count II, the Court adopted a Magistrate Judge's Report and Recommendation that concluded that Wyoming law does not have a tort cause of action for invasion of privacy. *Id*. at 692-93. As to Count III, the Court held that the ECPA does not allow for secondary liability. *Id*. at 674-75. The Byrds apparently conceded that they could not maintain a cause of action for Count IV. *Id*. at 694. Accordingly, the ECPA claim in Count I is "the only remaining claim." *Id*. at 675.

The Court also denied Aspen Way's Motion to Dismiss for Lack of Personal Jurisdiction. *Id*. at 675-76. In a separate order on March 31, 2014, the Court denied the Byrds' motion for class certification. *Byrd v. Aaron's, Inc.*, 2014 WL 1316055, at *1 (W.D. Pa. Mar. 31, 2014). On April 16, 2015, the Third Circuit

reversed the denial of class certification. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 160 (3d Cir. 2015). Since the District Court received the Third Circuit's mandate, there apparently has been a discovery dispute but there is no scheduling order in place. *See* Minute Entries (Docs. 371, 374, 377, 381), *Byrd v. Aaron's Inc.*, Civil Action No. 1:11-101-CB-SPB (W.D. Pa. May 26, June 24, July 29, and August 25, 2015).

In May 2011, Aspen Way demanded coverage from Liberty Mutual for the Byrd Action. Liberty Mutual agreed to defend Aspen Way, but did so under a complete reservation of rights. (Doc. 62-30). In particular, Liberty Mutual reserved the right to institute a declaratory judgment action and withdraw its defense at any point. (*Id.* at 8-9).

### B. The Washington Action

On October 18, 2013, the State of Washington sued Aspen Way in Spokane County Superior Court, Washington ("Washington Action"). (Doc. 33 at 4). In the Complaint for Injunctive and Other Relief, the State claimed that Aspen Way installed PC Rental Agent and Detective Mode without adequate notice to customers. (Doc. 62-7 at 4). The State also made allegations similar to the Byrd Action regarding PC Rental Agent and Detective Mode's capabilities. (*Id.*). The State alleged that Detective Mode relayed private information via email to Aspen Way stores located in Washington without any customer knowledge. (*Id.*).

The State's Complaint contained four causes of action. Count 1 alleged that Aspen Way made material misrepresentations to its customers by failing to alert them to the presence or capabilities of Detective Mode in violation of Washington's Consumer Protection Act, RCW 19.86.020. (*Id.* at 5). Count 2 alleged that Aspen Way collected their customers' private information in violation of Washington's Computer Spyware Act, RCW 19.270.020. (*Id.* at 6). Count 3 alleged that Aspen Way violated the Computer Spyware Act by failing to provide to its customers the ability to decline the installation of Detective Mode. (*Id.* at 8). Finally, Count 4 alleged that Aspen Way violated the Consumer Protection Act by unfairly collecting their customers' private information and pictures. (*Id.* at 9). Although Count 4 is titled "Unfair Collection and Disclosure of Private and Confidential Information," the State did not allege there was any disclosure. Instead, the State alleges that it was the "unfair gathering of extremely private information" that caused injury to the consumers. (*Id.*).

On February 4, 2015, the State and Aspen Way entered into a Consent Decree. (Doc. 62-8). Aspen Way did not admit to the alleged violations of Washington law, but Aspen Way agreed to an injunction against installing software similar PC Rental Agent and Detective Mode. (*Id.* at 5-7). Violating the injunction could cost Aspen Way as much as $25,000 per violation. (*Id.* at 7).

8

Aspen Way also agreed to pay $150,000 to the State to cover the costs of instituting the Washington Action and for monitoring and enforcing the Consent Decree. (*Id.*). Liberty Mutual paid the $150,000 to the State on behalf of Aspen Way, but noted that the payment did not constitute an admission or waiver regarding this declaratory judgment action. (Doc. 62-34 at 2). Liberty Mutual reserved the right to seek recoupment of the settlement payment from Aspen Way upon a declaration of non-coverage. (*Id.*).

## C. Liberty Mutual's Policies

Aspen Way had a total of six policies with Liberty Mutual that are implicated by the Byrd and Washington Actions. These consisted of three primary policies and three umbrella policies.

The primary policies were issued by General Insurance in 2010 (Docs. 62-9 through 19) and by American Economy in 2011 (Docs. 62-20 and 21) and 2012 (Docs. 62-22 through 26). The primary policies provide for two coverages: Coverage A and Coverage B. Aspen Way's Coverage A liability provision is triggered when allegations of "bodily injury" or "property damage" are made. (Doc. 62-13 at 14). Aspen Way's Coverage B liability provision is triggered when allegations of "personal and advertising injury" are made. (*Id.* at 19). The definitions section provides:

9

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

> ...**d.** Oral or written publication, in any manner, of material that violates a person's right of privacy[.]

(*Id.* at 28).

In an endorsement that modified some policy language, the primary policies

contain an exclusion entitled the "Recording and Distribution of Material or

Information in Violation of Law Exclusion" ("Recording and Distribution

Exclusion"). (*Id.* at 31). The Recording and Distribution Exclusion applies to both

Coverages A and B. (*Id.*). In relation to Coverage B, it provides:

**2.** Exclusions

> This insurance does not apply to:

> **p. Recording and Distribution of Material Or Information In Violation of Law**

>> "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

>> ...**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

(*Id.*).

10

In addition to the three primary policies, American States issued umbrella policies to Aspen Way in 2010 ("2010 Umbrella Policy") (Doc. 62-27), 2011 ("2011 Umbrella Policy") (Doc. 62-28), and 2012 ("2012 Umbrella Policy") (Doc. 62-29). The umbrella policies provide liability coverage to Aspen Way for allegations of "bodily injury," "property damage," "personal injury," or "advertising injury." (*See* Doc. 62-27 at 28). The umbrella policies provide coverage for amounts in excess of the amount other insurance would pay. (*Id.* at 34-35).

All three umbrella policies have the Recording and Distribution Exclusion. However, the 2010 and 2011 Umbrella Policies contain what Liberty Mutual argues is a clerical error. Under the Recording and Distribution Exclusion in the 2010 and 2011 Umbrella Policies, the insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury:"

> [A]rising directly or indirectly out of any action or omission that violates or is alleged to violate:
>
> ...**d.** Any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that collection, recording, sending, transmitting, communicating, or distribution of material or information.

(*Id.* at 22; Doc. 62-28 at 16). It is nearly identical to the Recording and Distribution Exclusions contained in the primary polices, with one notable exception. Between "...FCRA and their amendments and additions..." and "...the

printing, dissemination ...," the primary policies contain the verbs "that addresses, prohibits, or limits." (Doc. 62-13 at 31). However, the 2010 and 2011 Umbrella Policies lack any verb between "...FCRA and their amendments and additions..." and "...that collection, recording..." (Doc. 62-27 at 22; Doc. 62-28 at 16). Without those verbs, that subsection of the Recording and Distribution Exclusion in the 2010 and 2011 Umbrella Policies is an incomplete sentence that does not make sense.

Included with the 2010 and 2011 Umbrella Policies was a "Notice to Policyholders." (Doc. 62-27 at 24; Doc. 62-28 at 18). The Notice explained the Recording and Distribution Exclusion and stated that it was intended to "more explicitly exclude liability coverage for...injury arising out of any action or omission that violates, or is alleged to violate...federal, state or local statute, ordinance or regulation concerning disposal and dissemination of personal information." (*Id.*). The Notice explicitly stated that it was not part of the policy and that the policy provisions trumped any conflict they may have with the Notice. (*Id.*). Aspen Way claims to have had no knowledge of the alleged typographical errors in the Recording and Distribution Exclusions contained in the 2010 and 2011 Umbrella Policies. (Doc. 75-1 at 4).

The 2012 Umbrella Policy had a Recording and Distribution Exclusion that mirrored the ones contained in the primary policies with verbs in the appropriate

12

place. The Recording and Distribution Exclusion in the 2012 Umbrella Policy

excluded coverage from any injury:

[A]rising directly or indirectly out of an action or omission that violates or is alleged to violate:

...**d**. Any federal, state, or local statute, ordinance, or regulation...that *addresses, prohibits, or limits* the printing dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

(Doc. 62-29 at 24 with emphasis added to reflect the additional verbiage). The

same "Notice to Policyholders" was included with the 2012 Umbrella Policy. The

Notice also explained that the Recording and Distribution Exclusion in the 2012

Umbrella Policy "adds language that was mistakenly omitted in the original

version." (Doc. 62-29 at 8).

## **D. The Instant Action**

Liberty Mutual initiated this action against Aspen Way and Hartford Fire

Insurance Company on January 22, 2014. (Doc. 1). Liberty Mutual seeks a

declaratory judgment that it does not owe Aspen Way a duty to defend in the Byrd

Action and did not owe a duty to defend in the Washington Action. (*Id*. at 31-33).

Liberty Mutual also wants an order directing Aspen Way to reimburse General

Insurance and American Economy for sums already spent defending the Byrd and

Washington Actions under the primary policies. (*Id*. at 32). Finally, Liberty

Mutual wants reformation of the Recording and Distribution Exclusions in the

13

2010 and 2011 Umbrella Policies to match the language of the same exclusion in the 2012 Umbrella Policy and the primary policies. (*Id.* at 34-38). Liberty Mutual did not state a cause of action against Hartford Fire Insurance Company, and the Court later realigned the parties for jurisdictional purposes. (*See* Doc. 49).

Aspen Way answered and filed a counterclaim against Liberty Mutual. Aspen Way's counterclaim asserts two causes of action against Liberty Mutual: (1) Violation of the Unfair Trade Practices Act ("UTPA"); and (2) Breach of contract. (Doc. 12 at 25-28).

Liberty Mutual now moves for summary judgment against Aspen Way and asserts that the facts alleged in the Byrd and Washington Actions do not entitle Aspen Way to coverage. First, Liberty Mutual argues that coverage is not triggered, as neither action alleges "personal or advertising injury." Second, Liberty Mutual argues that even if there were allegations of "personal or advertising injury," coverage is precluded by the Recording and Distribution Exclusions.[1] Finally, Liberty Mutual argues that Aspen Way's counterclaims fail as a matter of law.

Aspen Way opposes the motion and advances several arguments. First, Aspen Way argues that coverage is triggered by allegations of "bodily injury" and

---

[1] Liberty Mutual also argues that the Intentional Acts Exclusion bars coverage. The Court does not reach that issue, and the Intentional Acts Exclusion is not reproduced or discussed in this Order.

"personal and advertising injury." Aspen Way also argues the Recording and Distribution Exclusions do not apply for reasons that will be discussed later. Finally, Aspen Way argues that its UTPA claim is a jury question.

## II. Standards

### A. Summary Judgment Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Anderson*, 477 U.S. at 256–57. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza*, 545 F.3d 702, 707 (9th Cir.2008). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

15

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Id.* The court should not weigh the evidence and determine the truth of the matter, but determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

### B. Duty to Defend Standard

Under Montana law, an insurer's "duty to defend is independent from and broader than the duty to indemnify created by the same insurance contract." *Farmers Union Mut. Ins. Co. v. Staples*, 90 P.3d 381, 385 (Mont. 2004). The duty to defend "arises when a complaint alleges facts which represent a risk covered by the terms of an insurance policy." *Blair v. Mid-Continent Cas. Co.*, 167 P.3d 888, 891 (Mont. 2007). An insurer must also defend its insured if it knows facts not contained in the complaint which may give rise to coverage. *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 928 (Mont. 2009).

"Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." *Staples*, 90 P.3d at 385. In other words, the duty to defend arises when a complaint alleges or avers facts, which if proven, would result in coverage. *Id.* This Court "must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated." *Id.*

16

## III. The Byrd Action

The question of whether Liberty Mutual had a duty to defend Aspen Way in the Byrd Action and the Washington Action requires separate analyses. The Court will start with the Byrd Action.

### A. Whether the Byrd Action alleges "personal and advertising injury"

Liberty Mutual argues that coverage is not triggered in the Byrd Action. At issue is whether the Byrd Action alleges facts that could have caused "personal and advertising injury." As discussed above, "personal and advertising injury" includes "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." (Doc. 62-13 at 14). "Publication" is not defined in the policy. The Court must first define "publication," and then apply that definition to the allegations in the Byrd Action.

An insurance policy's terms are given their usual and common sense meaning from the viewpoint of an ordinary consumer. *Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 184 P.3d 1021, 1025 (Mont. 2008). To determine a word's usual and commonsense meaning, the Montana Supreme Court sometimes looks to the word's dictionary definition. *See Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 396-97 (Mont. 2008); *Fisher ex rel. McCartney v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861, 866 (Mont. 2013); and *Portal Pipe Line Co. v. Stonewall Ins. Co.*, 845 P.2d 746, 751 (Mont. 1993). Dictionaries

17

commonly define "publication" as including disclosure to the public. *See*

*Webster's Third New International Dictionary* 1836 (Philip Babcock Gove ed.

1981) (defining "publication," in part, as "communication (as of news or

information) to the public"); *New Oxford American Dictionary* 1411 (Angus

Stevenson & Christine Lindberg eds., 3rd ed. 2010) ("the action of making

something generally known"); and *The American Heritage Dictionary* 1424

(Joseph Pickett ed., 5th ed. 2011) ("Communication of information to the public").

Some courts hold that the "public" does not necessarily mean the public-at-

large, but can include a third party. For example, the Eastern District of

Pennsylvania's "dictionary of choice" made "clear that promulgation to the public,

even to a limited number of people, is the essence of *publication.*" *OneBeacon*

*Am. Ins. Co. v. Urban Outfitters, Inc.*, 21 F. Supp. 3d 426, 437 (E.D. Pa. 2014)

(emphasis in original) (citing XII *The Oxford English Dictionary* 782 (2nd

ed.1989)). The Supreme Court of Connecticut reasoned that "[c]ommon sense

dictates that a lay person would understand the term 'publication' to mean the

communication of words to a third person." *Springdale Donuts, Inc. v. Aetna Cas.*

*& Sur. Co. of Illinois*, 724 A.2d 1117, 1122 (Conn. 1999). The Eastern District of

Louisiana held that there is personal and advertising injury when there is

"publication to a third party" and the material is "generally known, announced

publicly, disseminated to the public, or *released for distribution.*" *Ticknor v.*

*Rouse's Enterprises, LLC*, 2 F. Supp. 3d 882, 896 (E.D. La. 2014) (emphasis added).

This Court adopts a definition of "publication" that includes the dissemination of information to at least a third party, if not the public-at-large. This liberal definition of "publication" conforms with Montana's strong policy of construing insurance policy terms in the insured's favor. *Pablo v. Moore*, 995 P.2d 460, 463 (Mont. 2000). Viewing the term "publication" from the perspective of a consumer of average intelligence, this Court concludes that "publication," as used in Liberty Mutual's definition of "personal and advertising injury," occurs when information is transmitted to a third party.

The Court further finds that the Byrd Action alleges sufficient facts to trigger the duty to defend under Liberty Mutual's Coverage B for "personal and advertising injury." By liberally construing the Corrected Third Amended Class Action Complaint, the plaintiffs allege facts that, if proven, would result in coverage. The Byrds allege that their private information was collected by PC Rental Agent and "has been repeatedly transmitted via unencrypted email and forwarded to unknown persons and locations." (Doc. 62-3 at 29). Both the Byrds and the members of the putative class action allege they suffered injury after their information "may have been possibly transmitted to other third parties thereby placing them at an increased risk of fraud and identity theft." (*Id.* at 24). The

Byrds claim that despite Aspen Way's cessation of their use of Detective Mode, "unknown individuals continue to possess and potentially spread" their private information. (*Id.* at 33).

Assuming those allegations as true, Aspen Way may have violated the ECPA. The ECPA prohibits the intentional disclosure or use of any intercepted electronic communication. 18 U.S.C. § 2511(1)(c), (d). If the plaintiffs in the Byrd Action prove all their allegations against Aspen Way, the plaintiffs will have suffered "personal and advertising injury" as defined in Liberty Mutual's policies. Accordingly, there has not been an "unequivocal demonstration" that the Byrd Action does not fall within the policies' coverage. *Staples*, 90 P.3d at 386.

### B. Reformation of the 2010 and 2011 Umbrella Policies

Now that the Court has found that coverage is triggered in the Byrd Action, the next question is whether coverage is precluded by the Recording and Distribution Exclusion. The Court first must decide how to construe the Recording and Distribution Exclusions in the 2010 and 2011 Umbrella Policies. As discussed above, the exclusions in the 2010 and 2011 Umbrella Policies are missing key verbs that are present in the primary policies and the 2012 Umbrella Policy. Liberty Mutual argues that this Court should reform the Recording and Distribution Exclusion in the 2010 and 2011 Umbrella Policies to mirror the same exclusion in the 2012 Umbrella Policy. This Court agrees.

Mont. Code Ann. § 28-2-1611 provides:

When, through fraud or a mutual mistake of the parties or a mistake of one party while the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons in good faith and for value.

"The mistake of the scrivener or draftsperson who prepared the instrument alone is insufficient grounds for reformation." *Goodman Realty, Inc. v. Monson*, 883 P.2d 121, 123 (Mont. 1994). There must be "fraud, mutual mistake, or a mistake by one of the parties that the other party knew of or suspected." *Estate of Irvine v. Oaas*, 309 P.3d 986, 990 (Mont. 2013). The mistake must be proven by clear and convincing evidence. *Thibodeau v. Bechtold*, 198 P.3d 785, 789 (Mont. 2008).

The reformation of a contract is not limited to the correction of language errors, but can include inquiring into the contract's meaning and intent. *Estate of Irvine*, 309 P.3d at 990. Courts cannot change the meaning of a contract through reformation, but rather courts are limited to the parties' mutual intent. *Id.* Further, "negligence of the party creating the mistake is not necessarily a bar to judicial reformation of a contract." *E.H. Oftedal & Sons, Inc. v. State ex rel. Montana Transp. Comm'n*, 40 P.3d 349, 359 (Mont. 2002). However, an aggrieved party that knew of the mistake when the contract was executed cannot rely on a unilateral mistake to reform a contract. *Goodman Realty*, 883 P.2d at 124.

21

The Montana Supreme Court has not addressed whether Montana law allows reformation of an insurance policy. *See Lincoln Cnty. Port Auth. v. Allianz Global Risks U.S. Ins. Co.*, 315 P.3d 934, 942 (Mont. 2013). However, this Court finds that reformation of an insurance policy is consistent with Montana law. "[A]n insurance policy is a contract and is therefore subject to the applicable contract law of Montana." *Bailey v. State Farm Mut. Auto. Ins. Co.*, 300 P.3d 1149, 1153 (Mont. 2013). This includes the interpretation of an insurance contract's terms. *Lincoln Cnty. Port Auth.*, 315 P.3d at 942. Reformation allows contracts to be interpreted according to the parties' mutual intent. *Estate of Irvine*, 309 P.3d at 990. Since reformation is a principle of contract interpretation, and the interpretation of insurance policies is subject to contract law, Montana law allows the reformation of insurance policies.

Here, the Court finds that Liberty Mutual has shown by clear and convincing evidence that omitting the words in the Recording and Distribution Exclusions contained in the 2010 and 2011 Umbrella Policies constitutes a mistake by Liberty Mutual that Aspen Way should have suspected. Therefore, the Court reforms the Recording and Distribution Exclusions contained in those policies to mirror the same exclusion found in the 2012 Umbrella Policy.

As reproduced above, the exclusions in the 2010 and 2011 Umbrella Policies preclude coverage for any action arising from:

22

**d.** Any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that collection, recording, sending, transmitting, communicating, or distribution of material or information.

(*Id.* at 22; Doc. 62-28 at 16). The lack of verbs or any connecting words between "amendments and additions," and "that collection" renders the sentence nonsensical.

Liberty Mutual's intention is evidenced by other documents in Aspen Way's possession when it received the 2010 and 2011 Umbrella Policies. A Notice to Policyholders accompanied both policies. The Notice stated that the Recording and Distribution Exclusion was designed to explicitly exclude "liability coverage for...injury arising out of any action or omission that violates, or is alleged to violate...federal, state or local statute, ordinance or regulation concerning disposal and dissemination of personal information." (Doc. 62-27 at 24; Doc. 62-28 at 18). Further, Aspen Way possessed primary policies for 2010 and 2011 that contained the Recording and Distribution Exclusion that clearly precluded coverage for any action arising under:

...**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

(Doc. 62-13 at 31). Finally, the Notice to Policyholders accompanying the 2012 Umbrella Policy stated that it contained an updated Recording and Distribution Exclusion that "adds language that was mistakenly omitted in the original version." (Doc. 62-29 at 8).

If Aspen Way read the Recording and Distribution Exclusions contained in the 2010 and 2011 Umbrella Policies, it would have at least suspected that Liberty Mutual mistakenly omitted words. The Notice to Policyholders and the correct language contained in the primary policies signaled the mutual intent as to the meaning of the Recording and Distribution Exclusions. There is clear and convincing evidence that Liberty Mutual intended to include the key verbs in the 2010 and 2011 Umbrella Policies, but mistakenly omitted them.

Given the Notice to Policyholders and the correct language in the primary policies, the Court finds there is also clear and convincing evidence that Aspen Way suspected the error. At the very least, Aspen Way would have suspected the mistake had it read the policies. Finally, it was the mutual intent of the parties to include the correct version of the Recording and Distribution Exclusion in the 2010 and 2011 Umbrella Policies. Even with the mistake, the exclusion's goal is obvious – to preclude coverage for allegations alleging a violation of federal statute pertaining to the collection of information. Aspen Way accepted the

Recording and Distribution Exclusions, as it paid the premiums and accepted the policies.

The Court is not persuaded by Aspen Way's attempt to create a dispute of material fact. In an affidavit, Aspen Way's CEO states that "Aspen Way had no knowledge of the alleged typographical error purported to be contained in [Liberty Mutual's] 2010 and 2011 Umbrella Policies" and that "Aspen Way had no intent or understanding that the phrase 'addresses, prohibits or limits the printing, dissemination, disposal' should have been included in the 2010 and 2011 Umbrella Policies' [Recording and Distribution Exclusions]." (Doc. 75-1 at 4-5). Aspen Way's CEO did not deny suspecting there was an error.

While conflicting evidence is usually viewed in a favor of the nonmoving party, only "rational" or "reasonable" inferences are sufficient to defeat a motion for summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted). In viewing the record as a whole, the Court finds that a rational fact finder could not conclude that Aspen Way did not know, or at the very least suspect, that Liberty Mutual made an error in those exclusions. As contained in the 2010 and 2011 Umbrella Policies, the Recording and

25

Distribution Exclusions are nonsensical. They are obviously missing some verbs. It is clear which verbs are missing when the 2010 and 2011 Umbrella Policies are read in conjunction with the Notice to Policyholders and the primary policies. If Aspen Way read the exclusions, it could not credibly claim that it did not suspect an error. Notably, Aspen Way does not propose an alternative reading of the exclusions or describe how Aspen Way interpreted them.

Accordingly, the Court will reform the Recording and Distribution Exclusions in the 2010 and 2011 Umbrella Policies to mirror the same exclusion found in the 2012 Umbrella Policy found at Doc. 62-29 at 24. Subsection (d) of the Recording and Distribution exclusion in all the umbrella policies shall preclude coverage from any action alleging a violation of:

**d**. Any federal, state, or local statute, ordinance, or regulation, other than the TCPA or CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

*(See* Doc. 62-29 at 24).

## C. Applying the Recording and Distribution Exclusion

The next step is determining whether the Byrd Action is excluded from coverage. "Exclusions from coverage are to be narrowly and strictly construed because they are contrary to the fundamental protective purpose of an insurance policy." *Steadele v. Colony Ins. Co.*, 260 P.3d 145, 149 (Mont. 2011). An

26

exclusion is ambiguous if it is reasonably subject to two interpretations. *Id.* Any

ambiguity "is to be interpreted most strongly in favor of the insured and any doubts

as to coverage are to be resolved in favor of extending coverage for the insured."

*Id.* However, courts should not "seize upon certain and definite covenants

expressed in plain English with violent hands, and distort them so as to include a

risk clearly excluded by the insurance contract." *Travelers Cas. & Sur. Co. v. Ribi

Immunochem Research, Inc.*, 108 P.3d 469, 474 (Mont. 2005) (internal quotation

omitted). "Ambiguity does not exist just because a claimant says so or just

because the parties disagree as to the meaning of the contract provision."

*Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 672 (Mont. 2009).

Here, the Court finds that coverage for the Byrd Action is excluded by the

Recording and Distribution Exclusion. As mentioned numerous times above, the

Recording and Distribution Exclusion precludes coverage from any suit that

alleges a violation of a federal statute that prohibits the transmitting or distribution

of material or information. The only remaining count in the Byrd Action is the

allegation that Aspen Way violated the ECPA by using Detective Mode. The

ECPA is a federal statute that prohibits the disclosure or use of intercepted

electronic communications. 18 U.S.C. § 2511(1)(c), (d). Since the ECPA is a

federal statute as described by the Recording and Distribution Exclusion, the

27

Byrds' allegation that Aspen Way violated the ECPA by transmitting and collecting personal information is excluded from coverage.

The Court is not persuaded by Aspen Way's efforts to avoid a straightforward application of the Recording and Distribution Exclusion. First, Aspen Way argues that the exclusion is ambiguous due to its use of the phrase "arising directly or indirectly out of any action or omission." Aspen Way correctly states that under Montana law, the phrase "arising out of" is inherently ambiguous in the insurance context. *Troutt v. Colorado W. Ins. Co.*, 246 F.3d 1150, 1160 (9th Cir. 2001). However, Aspen Way does not propose an alternate interpretation of the phrase "arising directly or indirectly out of any action or omission." (Doc. 62-13 at 31). A policy's term is not automatically invalidated because it is found to be ambiguous. Instead, the ambiguous provision is given the construction that favors the insured. *Pablo*, 995 P.2d at 463.

This Court cannot imagine a reasonable construction of the phrase "arising directly or indirectly out of any action or omission" that would render the Recording and Distribution Exclusion inapplicable to the Byrd Action. In *Wendell v. State Farm Mut. Auto. Ins. Co.*, the Montana Supreme Court determined that the phrase "arising out of the use" in uninsured motorist coverage was ambiguous as it was reasonably subject to more than one interpretation. 974 P.2d 623, 638-39 (Mont. 1999). The phrase could be constructed narrowly to mean that the

uninsured vehicle was the instrument that caused injury. *Id.* at 639. The phrase "arising out of the use" could also be construed broadly to mean "originate from, or grow out of, or flow from the use." *Id.* The Montana Supreme Court applied the broad interpretation as it favored the insured. *Id.* at 639-40. Similarly, in *Pablo*, the Montana Supreme Court held that "arising out of" was ambiguous. 995 P.2d at 462-63. The term could be construed broadly as in *Wendell*. However, since a narrower construction benefitted the insured, the Court interpreted "arising out of" to be limited to torts specifically related to the use of a vehicle. *Pablo*, 995 P.2d at 400.

Here, the Court cannot find a reasonable construction of "arising directly or indirectly out of any action or omission" that results in coverage for Aspen Way. Whether the Court applies a broad definition as in *Wendell* or a narrow definition as in *Pablo*, the Byrd Action arises out of Aspen Way's alleged violation of the ECPA.

Aspen Way claims that "other courts have also deemed this exclusion ambiguous." (Doc. 74 at 24). However, Aspen Way does not cite any such cases. The case Aspen Way immediately cites after that statement actually applied the Recording and Distribution Exclusion to preclude coverage. *Big 5 Sporting Goods Corp. v. Zurich Am. Ins. Co.*, 957 F. Supp. 2d 1135, 1151 (C.D. Cal. 2013).

Aspen Way also argues that the common law invasion of privacy allegations contained in Count II were dismissed only as to Aaron's but remain intact against Aspen Way. As discussed in the beginning, Count I in the Byrd Action alleges the violation of the ECPA and Count II alleged the tort of invasion of privacy. (Doc. 62-3 at 34-40). Aspen Way assumes that Count II would not be excluded by the Recording and Distribution Exclusion as it does not allege a violation of a statute, regulation, or ordinance. If true, Liberty Mutual would be required to defend against all counts under the "mixed-action rule." *See State Farm Fire & Cas. Co. v. Schwan*, 308 P.3d 48, 51 (Mont. 2013).

Aspen Way misreads the District Court's Order that dismissed Counts II, III, and IV. The District Court clearly dismissed every count in its entirety except Count I by describing it as the "only remaining claim." *Byrd*, 14 F. Supp. 3d at 675. Count II was dismissed as the tort of invasion of privacy is not recognized in Wyoming law. *Id.* at 692. Since Count II is not a viable claim, the Byrds could not pursue it against any defendant. Count III was dismissed because the ECPA does not allow for secondary liability. *Id.* at 674-75. The Byrds apparently abandoned Count IV. *Id.* at 693-94. The District Court concluded that Counts II, III, and IV were not legally viable. Accordingly, they were dismissed in their entirety.

Aspen Way presents the alternative argument that even if Count II was dismissed in its entirety, under the "mixed-action rule" the duty to defend continues even after the covered claim's dismissal until all claims are completely extinguished. However, the Montana Supreme Court rejected that argument in *City of Bozeman v. AIU Ins. Co.*, 865 P.2d 268 (Mont. 1993). In *City of Bozeman*, the Court held that an insurer can withdraw its defense of an insured upon the dismissal of the potentially-covered claim if there is not an immediate appeal of the dismissal. *Id.* at 273. The insurer must resume the defense if an appellate court later remands the case and revives the dismissed claim. *Id.*; *see also* 14 Steven Plitt et al., *Couch on Insurance* § 200:48 (3d ed. 2015) ("If the covered claims have been dismissed in the underlying action, an insurer's duty to defend is generally terminated"). The Court finds that success on appeal of the dismissal of Count II is unlikely, as Wyoming law clearly does not recognize the tort of invasion of privacy. *See Byrd*, 14 F. Supp. 3d at 692.

In conclusion, a narrow reading of the Recording and Distribution Exclusion shows that the Byrd Action is precluded from coverage under Liberty Mutual's policies. Since there is no coverage, Liberty Mutual does not owe a duty to defend Aspen Way in the Byrd Action.

31

## D. Bodily Injury

Aspen Way argues that even if there is no coverage for the alleged "personal or advertising injury," there is coverage under Coverage A for "bodily injury." The Court does not reach the question of whether the Byrd Action alleges "bodily injury," as bodily injury is also excluded from coverage by the Recording and Distribution Exclusion. (Doc. 62-29 at 24).

## IV. The Washington Action

The Court also finds Liberty Mutual did not owe a duty to defend Aspen Way in the Washington Action. However, the Court does not consider whether coverage is precluded by the Recording and Distribution Exclusion in the Washington Action. Instead, the Court determines that coverage was not triggered, as the State did not allege the requisite "publication" to trigger coverage for "personal and advertising injury."

As discussed above, Liberty Mutual's policies provide coverage for allegations of "personal and advertising injury." (Doc. 62-13 at 19). "Personal and advertising injury" means injury arising out of "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." (*Id.* at 28). As stated above, this Court defines "publication" in this context as dissemination of information to at least a third party.

In the Washington Action, the Court finds that the State has not alleged facts, which if proven, would have amounted to "publication." The crux of the State's Complaint was that Aspen Way violated Washington law by collecting and retaining their customers' private data. Count 1 alleged a violation of Washington's Consumer Protection Act by misrepresenting and failing to alert customers to PC Rental Agent's capabilities. (Doc. 62-7 at 6). Count 2 alleges deceptive collection of private information in violation of Washington's Computer Spyware Act. (*Id.* at 7). Count 3 alleges a violation of the Computer Spyware Act by remotely installing Detective Mode without the customers' knowledge and by not allowing the customers the option of withholding consent to its installation. (*Id.* at 8). Finally, Count 4 alleges another violation of the Consumer Protection Act by collecting private and confidential information. (*Id.* at 9). Although Count 4 is titled "Unfair Collection and Disclosure of Private and Confidential Information," the alleged facts, not the titles of the causes of action, are dispositive. The State did not allege that Aspen Way disclosed any private information. Instead, the allegations focused on Aspen Way's use of "PC Rental Agent to collect information on consumers" and "collect private computer activity while consumers were unaware of the activities being recorded." (*Id.*).

The State in the Washington Action did not allege facts that, if proven, would amount to "publication." Accordingly, the State did not allege "personal or

33

advertising injury" and coverage was not triggered. The allegations focused on
Aspen Way's installation of Detective Mode and the retention of data. The mere
act of collection was an alleged violation of Washington law. This is in contrast
with the Byrd action, where Aspen Way could be held liable under the ECPA for
disclosing or transmitting private information to third parties. Since the
Washington Action was not covered under the policies, Liberty Mutual did not
owe a duty to defend.

## V. Aspen Way's counterclaims

Liberty Mutual is also entitled to summary judgment on Aspen Way's
counterclaims. As discussed above, Liberty Mutual has not breached their
contracts with Aspen Way. Further, since there is no coverage, Liberty Mutual had
"a reasonable basis in law or in fact for contesting the claim" and Aspen Way's
counterclaim under the UTPA also fails. Mont. Code Ann. § 33-18-242.

## VI. Conclusion

For reasons discussed above, IT IS HEREBY ORDERED:

1. Liberty Mutual's Motion for Summary Judgment (Doc. 60) is
GRANTED.

2. Liberty Mutual did not owe Aspen Way a duty to defend or indemnify in
the Washington Action.

34

3. Liberty Mutual does not owe Aspen Way a duty to defend or indemnify in the Byrd Action.

4. Aspen Way's Motion to Strike (Doc. 84) is DENIED AS MOOT. The Court did not rely upon or reference any of Liberty Mutual's statements or representations in its Responses to Aspen Way's Additional Facts (Doc. 83).

5. Liberty Mutual shall file a brief within 14 days indicating whether it seeks an order requiring reimbursement of its already expended costs as requested in the Complaint. Liberty Mutual must state the legal authority for its claim. Aspen Way may file a response in opposition to Liberty Mutual's position within 14 days of Liberty Mutual's opening brief.

DATED this 24th day of September, 2015.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge

35